THE UNITED STATES PIPE LINE COMPANY AND HARRY W. BRECKENRIDGE, PLAINTIFFS IN ERROR, v. THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, DEFENDANT IN ERROR.

Argued June 22, 1898—Decided November 14, 1898.

1. The Morris and Essex Railroad Company was incorporated in 1835 (*Pamph. L.*, p. 25), with all the rights and powers necessary to lay out and construct a railroad or railroads, with the power of purchasing and holding any lands and tenements necessary and expedient for the objects of the incorporation, with power to enter upon, take possession of, have, hold, use, occupy and excavate any such lands and to do all things which shall be suitable and necessary for the completion or repair of their railroad.    Section 7 of the charter enacted that the com-

pany might acquire lands on which its railroad should be located, by condemnation proceedings, and when such condemnation proceedings were consummated as provided by the act, then the company should be deemed to be seized and possessed in fee-simple of such lands and real estate. The company laid out a railroad from Hoboken to Phillipsburg, and located its route over and across a tract of land of Cornelius Stewart, separating the same into two parcels. By deed dated March 26th, 1864, Stewart conveyed to the railroad company a strip of uniform width of seventy-five links on each side of the centre line of the railroad, reciting in the deed that the tract of land described was necessary to be taken by the company as part of the route of the extension of their railroad. By this deed the grantors, for the consideration named, did "grant, bargain, sell, convey and confirm to the Morris and Essex Railroad Company, and to their successors and assigns forever, the tract of land described, with full power to make use of the same in all lawful ways for the purpose of the extension of their said railroad and as part of the route thereof." *Held*—

1. That the operative words of conveyance in this deed by the common law would vest in the corporation an estate in fee.

2. That the company's charter having expressed a legislative purpose that the company should be deemed to be seized and possessed in fee-simple of all lands acquired by condemnation, the capacity of the company to take by grant a fee and not a mere easement was demonstrated.

2. The *habendum* in the Stewart deed was "to have and to hold the said above-described land and premises with the appurtenances unto the Morris and Essex Railroad Company and their successors and assigns forever, for all the purposes mentioned in said act of incorporation and the supplements thereto passed and to be passed." *Held*—

1. That the qualifying words in the *habendum* clause amount simply to a qualification of the fee that enured to the company by the operative words of grant, and that the estate acquired by the company was a qualified fee or a fee-simple determinable.

2. That the company as the owner of a qualified fee has the same rights and privileges in the estate until the qualification upon which it is limited is at an end as if it held in fee-simple; that in the meantime the whole estate vested in the grantee subject only to a possibility of reverter to the grantor.

3. The deed from Stewart contained a stipulation that the company should erect and forever maintain under the rails of their railroad "a suitable wagon-road or crossing, which shall be at least thirteen feet wide by thirteen feet high, * * * so as to enable said Stewart to travel and cross freely between his lands on each side of said granted premises." The Morris and Essex Railroad Company took possession of the land conveyed and built its railroad upon it, with an embankment, under which it constructed an undergrade crossing, with masonry abut-

ments and wing-walls, of the height and width specified in the company's deed. The company completed and put in operation its road in 1865, and operated the same continuously until December, 1868, when it demised to the Delaware, Lackawanna and Western Railroad Company, by a lease validated by an act of the legislature, its franchises, together with all its lands, real estate, rights of way and all other property, for the full term of the continuance of its charter and all renewals thereof, whereby the title of the Morris and Essex Railroad Company to the premises in question became vested in the Delaware, Lackawanna and Western Railroad Company, the plaintiff. The latter company from that time has operated and is still operating the railroad for railroad purposes. The condition upon which the estate granted to the Morris and Essex Railroad Company would be determined has not arisen.

4. The trespass complained of consisted in the excavation of the soil in the bottom of the "wagon-road or crossing" under the railroad of the plaintiff reserved in the Stewart deed, and digging trenches and placing therein two contiguous lines of iron pipe, extending completely across the lands of the railroad company and forming part of the pipe line of the defendant company, which they are using as part of their pipe line for the purpose of carrying oil. The defendants justify, in the first place, under a deed dated August 30th, 1895, made by the heirs and devisees of Stewart to Breckenridge. The premises described in that deed are the same premises conveyed by Stewart to the Morris and Essex Railroad Company in 1864. *Held*, that as against the prior conveyance to the Morris and Essex Railroad Company the deed from the heirs conveyed no title to Breckenridge.

5. The stipulation in the deed from Stewart to the railroad company for a wagon-road or crossing operated as a grant of an easement appurtenant to the two parcels of land retained by Stewart. By divers mesne conveyances these two parcels became vested in Breckenridge. *Held*, that the right reserved or easement granted in the deed from Stewart to the railroad company created a right of way appurtenant to the two parcels of land retained by Stewart, which, in the devolution of title from Stewart to Breckenridge, passed to the several grantees as an appurtenant.

6. A stipulation in a deed reserving to the grantor a right in the nature of an easement will be construed in conformity with the rules which control in the construction of grants. One granting an easement may limit the grant, and the grantee takes subject to the restrictions imposed. The limitation may be with reference to the purposes for which the easement may be used; as, for instance, a right of way may be granted to be used for all purposes or for limited purposes only. In this case the grant is of a right of way as appurtenant to the premises retained by the grantor, restricted to a way of passage between the two parcels retained by him.

7. Where a grant is made of an easement or right of way to be used for a particular purpose, the grantor is not bound to submit to its being used for any other purpose. Whether the right claimed will impose a greater or less burden on the servient tenement than the right granted is an irrelevant inquiry.

8. The laying of the pipes in question in the roadway complained of in no sense conferred a benefit on the lands to which the way was appurtenant, nor were they adapted to facilitate or promote access between the two parcels of land to which the easement was appurtenant, and, therefore, the laying of these pipes was not justified under the right reserved in the Stewart deed.

9. Where the statute which authorizes the acquisition of lands by condemnation under the right of eminent domain authorizes the taking of a fee, it cannot be held that an easement only was acquired thereunder, on the ground that an easement only was necessary to accomplish the purposes for which the right of eminent domain was granted. *Green* v. *Morris and Essex Railroad Co.*, 1 *Beas.* 165, explained.

10. In an action of trespass the defendant may give title in evidence under the general issue, but a justification, such as leave and license or a private right of way, must be specially pleaded.

---

On writ of error to the Supreme Court.

Cornelius Stewart,
now Meagher.

250

Michael Meagher and Wife
to
Harry W. Breckenridge,
September 4th, 1895.

50

Cornelius    Stewart and Wife
Morris & Essex    to
Dated    Railroad Co.
March 26th, 1864.

Farm crossing.

100

* Michael Meagher and Wife
to
Harry W. Breckenridge,
September 4th, 1895.

50

250

* Pipe Lines.

Cornelius Stewart,
now Meagher.

This was an action brought by the Delaware, Lackawanna and Western Railroad Company against the United States Pipe Line Company and Harry W. Breckenridge, to recover damages for a trespass upon land situate in the county of Warren. At the trial the judge denied the defendants' motion to nonsuit, and at the close of the case directed a verdict in favor of the plaintiff. To these rulings exception was taken, whereupon the defendants sued out their writ of error.

The *locus in quo* on which the trespass is alleged to have been committed is, within the plaintiff's title, derived under a deed from Cornelius Stewart and wife to the Morris and Essex Railroad Company, made March 26th, 1864, hereinafter set out. The act the plaintiff complained of consisted in the excavation of the soil in the bottom of the "wagonroad or crossing," under the railroad of the plaintiff, reserved in the above-mentioned deed, and digging trenches and placing therein two contiguous lines of iron pipe, four and five inches in diameter, respectively, without the leave or license and against the will of the plaintiff. It was admitted by the defendants that they laid such pipes in October, 1895, in or about the middle of the crossing, extending completely across the lands of the railroad company described in the deed from Stewart, and that these pipes form a part of the pipe line of the defendant company, and that, since July, 1897, they have been used as a part of the defendants' pipe line for the purpose of carrying oil.

The exceptions taken and the assignments of error present two questions—first, that the defendants owned the soil in the crossing in fee and the railroad company had only an easement over it, and that the pipes, with the conveyance of oil, did not interfere with the use of the lands for all railroad purposes; and second, that the defendants had a right to run oil in the pipes through the crossing, under the terms of the reservation to Stewart, in his deed to the railroad company.

For the plaintiffs in error, *Henry S. Harris* and *Joseph M. Roseberry*.

For the defendant in error, *J. Franklin Fort* and *Chauncey G. Parker.*

The opinion of the court was delivered by

DEPUE, J.   The Morris and Essex Railroad Company was incorporated in 1835 (*Pamph. L., p.* 25), with all the rights and powers necessary to lay out and construct a railroad or lateral roads from Newark, in the county of Essex, to Morristown, with power of purchasing and holding, &c., any lands and tenements, &c., necessary and expedient to the objects of the incorporation—to enter upon, take possession of, have, hold, use and occupy and excavate any such lands, and erect embankments, bridges and all other works necessary, to lay rails and to do all things which shall be suitable or necessary for the completion or repair of said road, subject to such compensation as is provided in the act.   By section 7 of the charter it is enacted that if the owners of the lands on which such railroad or railroads shall be made shall not be willing to give the same for such purpose, and the company and owners cannot agree upon the price to be paid, then the company may proceed by condemnation proceedings to have the price or value of said lands assessed by commissioners, and when such condemnation proceedings are consummated as provided by the act and the price assessed paid, then the company shall be deemed to be seized and possessed in fee-simple of all such lands and real estate appraised as aforesaid.   By several supplements to the company's charter it was authorized to extend its railroad to Phillipsburg.   In the extension of its railroad from Hackettstown to Phillipsburg the company located its route over and across lands of Cornelius Stewart, separating the same into two parcels, one on each side of the company's located route.

By a deed dated March 26th, 1864, Stewart and wife conveyed to the Morris and Essex Railroad Company a tract of land containing three acres and eighty-seven hundredths of an acre, described in the deed of conveyance as consisting of a lot of land extending twenty-five chains and eighty-one

links, or thereabouts, along the centre line of said railroad as located, and of a uniform width of seventy-five links at right angles on each side thereof, and reciting that the tract of land so described was necessary to be taken by said company as part of the route of the extension of its railroad, and describing the premises by metes and bounds.

This conveyance was made for the consideration of $1,300, in consideration whereof the grantor, Stewart, did for himself, his heirs, executors and administrators, and also for his assigns, future owners of the lands of said Stewart adjoining the lands and premises thereby conveyed, exonerate, acquit and forever discharge the said Morris and Essex Railroad Company and its successors and assigns from all claims for damages for separating said adjoining lands of said Stewart into two parts by constructing a railroad on the premises granted. And the grantors, for the consideration aforesaid, did grant, bargain, sell, convey and confirm to the said Morris and Essex Railroad Company and to its successors and assigns forever, the tract of land and premises described in its deed, and with full power to make use of the same in all lawful ways for the purpose of the extension of its said railroad and as part of the route thereof, to have and to hold the said above-described tract of land and premises, with the appurtenances, unto the said the Morris and Essex Railroad Company and its successors and assigns forever, for all the purposes mentioned in said act of incorporation and the several supplements thereto passed and to be passed.

The operative words of conveyance in this deed are such as, by the common law, would vest in a corporation an estate in fee.

The deed contained a stipulation that the company should erect and forever maintain under the rails of its railroad, at a point where the same shall cross the land line between the lands of Stewart and Dufford, "a suitable wagon-road or crossing, which shall be at least thirteen feet wide by thirteen feet high, * * * so as to enable said Stewart to travel and cross freely between his lands, on each side of said granted

premises," together with suitable culverts and drains, to enable the water to run from the southeast to the northwest side of the premises granted. The deed also contained the usual covenant against encumbrances, with a covenant of warranty, to warrant, secure and forever defend the premises granted unto the said company for the purposes expressed in said deed.

By a lease dated December 10th, 1868, the Morris and Essex Railroad Company demised to the Delaware, Lackawanna and Western Railroad Company its franchises, together with all lands, real estate, rights of way, and all its other property and rights of every kind, real, personal and mixed, with the hereditaments and appurtenances, for the full term of the continuance of its charter and all renewals thereof. This lease was validated by an act of the legislature passed in 1869. The terms of the lease and of the act of validation are set out in *State Board of Assessors* v. *Morris and Essex Railroad Co.*, 20 *Vroom* 193, 207, 211. By force of this lease and the validating act the title of the Morris and Essex Railroad Company to the premises in question became vested in the plaintiffs.

Stewart died in 1884. By his will he devised all his estate, real and personal, to his wife, Elizabeth, to her and to her heirs and assigns forever. Elizabeth Stewart died in 1885, and by her will bequeathed all her real and personal property to her two daughters, Sarah Anderson and Mary Isabella Stewart. By a deed dated August 30th, 1895, Sarah A. Stewart and Mary Isabella Stewart conveyed to Breckenridge the premises described in said deed of conveyance, being the same lands and premises as had been conveyed by Cornelius Stewart and wife to the Morris and Essex Railroad Company, in 1864.

The defendant makes its title to the *locus in quo* under the conveyance last mentioned.

The position taken by counsel on this branch of the case is expressed in their briefs as follows: That the Morris and Essex Railroad Company, by its deed from Stewart, took

only an easement, and that the fee was conveyed to Breckenᵣridge by the deed from the heirs of Stewart, who had an estate remaining in him after he had conveyed to the company an easement, and that in virtue of that estate he and his grantees had a right to use the land so that it did not interfere with the use of the railroad company for railroad purposes, and that the pipes, with the conveyance of oil through them, did not interfere with the use of the land for all railroad purposes.

This contention raises the question of the nature and extent of title acquired by the railroad company under its charter for lands required for the construction and use of its railroad. The argument is that, by their charters, these companies can take by condemnation, not title, but an easement only, and that a grant of lands by the owner to such a company, no matter how expressed, will not confer any greater right or estate.

The power of the legislature to endow companies organized for public purposes with the capacity to acquire lands under the right of eminent domain is undisputed. Grants of this character, like all public grants, are to be strictly construed— what is not plainly given is withheld. The rule for the construction of public grants in strictness has never been extended beyond these principles. Wherever the legislature has given in plain terms that which the company has the capacity to take, the court is not justified in frittering away the legislative grant by denying the legal effect of words of technical signification contained in it, when on a reasonable construction there is nothing in the subject-matter or context which would prevent the grant so construed from taking effect.

The act incorporating the railroad company conferred upon the company the capacity of purchasing, holding and conveying any lands, tenements, goods and chattels whatsoever necessary or expedient to the object of its incorporation. It declares that the company may enter at all times upon all lands or water for the purpose of exploring, &c., and laying out the route or routes of their railroads, and that it should

be lawful for the company by its officers and agents to enter upon, take possession of, hold, have, use, occupy and excavate any such lands, with a proviso that payment or tender of payment of all damages for the occupancy of lands shall be made, &c. In these expressions, taken from different sections of the company's charter, power to take, hold, occupy and use lands for the construction of the company's railroads is conferred in express words. By the seventh section the company is authorized to resort to condemnation proceedings "if the owner of the land" and the company cannot agree as to the price for the same. By this section it is provided that the commissioners appointed in such proceedings are "to assess the price or value of the said land, and with their award transmit a description of said lands and the quantity taken and by whom owned and how situate, bounded and described in writing;" and if the company or the owner is aggrieved by the decision of the commissioners, either party may appeal to the courts; and it shall be the duty of the jury on the trial of the appeal to assess the value of said lands and all damages sustained, and upon payment or tender of the sum so found by the commissioners or by the jury, it is enacted that "the said corporation shall be deemed to be seized and possessed in fee-simple of all such lands and real estate." The powers conferred upon this company by its charter are so explicit as not to admit of construction. The meaning of the terms used being ascertained, construction is at an end. The company is to take under the designation of "lands," with the prescription that the condemnation when consummated shall be plenary evidence of the right of the company "to have, hold, use, occupy, possess and enjoy said lands." These are technical words of conveyance of legal signification wholly inapplicable to anything else than a corporeal hereditament— "land" in its legal signification. The charter further declares that on the payment of the price or value of such land the company should be deemed "to be seized and possessed in fee-simple of all such lands and real estate." The words in this legislative grant are entirely inappropriate to an ease-

ment.    They are senseless unless applied to such an estate as
in a legal sense is comprehended in the term " land," whereof
the unqualified use and possession are obtained for the legiti-
mate purposes of the railroad company.    *De Camp* v. *Hiber-
nia Railroad Co.,* 18 *Vroom* 43.

The title acquired by a railroad company by condemnation
under statutory powers similar to those contained in the
charter of the Morris and Essex Railroad Company was
elaborately discussed and decided in *New York, Susquehanna
and Western Railroad Co.* v. *Trimmer,* 24 *Vroom* 1.    That
case was an action of ejectment brought by the railroad
company under its title by condemnation against the original
owner, who refused to give possession.    The defence was that
the railroad company had " not title to the premises in ques-
tion, but only an easement in them," and that ejectment
would not lie founded on such a right.    The opinion was de-
livered by Chief Justice Beasley, who said that the rule that
ejectment is not an appropriate remedy when the enjoyment
of an easement is the subject of the suit has been often stated
and is in nowise questionable.    He added : " But the interest
in the lands now in question is not an easement.    In cases of
easements there must be not only a servient tenement, but also
a dominant one, and which latter constituent is entirely lack-
ing in the present instance.    The action of ejectment is
* * * a possessory remedy and can be resorted to only
when a right of entry exists and where the thing or interest
is tangible, so that possession can be given by the sheriff.    It
is manifest, therefore, that if the interest of the railroad com-
pany in these premises were a naked right of way it would
constitute no such right of possession of the land itself as
would sustain this action, for such a right would be an in-
corporeal one, upon which there could be no entry nor could
possession of it be given under an *habere facias possessionem.*
But manifestly such is not the right in this land that is vested
in this company, for can it be denied that the corporation has
a right to enter upon it, and that a judgment in its favor
could be executed by the officer putting it in possession ?

Unlike the use of a private way—that is, discontinuous—the use of land condemned by a railroad company is perpetual and continuous. So the latter is likewise necessarily exclusive. This is the doctrine strongly presented in the case of *De Camp* v. *Hibernia Railroad Co., supra,* for it was there declared that the company, by force of this statutory procedure, could not acquire a qualified right in the lands, the court saying: 'The statute only authorizes the taking of lands, and the occupation and use of lands, in the state and condition of lands in the legal sense of that term.' A reference to the statute by virtue of which the company has acquired its right in this property will at once make manifest the propriety of the view thus adopted. It is the twelfth section that prescribes the mode to be pursued in case the company cannot agree with the owner of the lands required. Commissioners are to be appointed, who are to appraise the land or materials and to assess the damages. The statute then declares, to use its own language, 'and thereupon and on payment or tender of payment of the amount awarded as hereinafter provided, the said company is hereby empowered to enter upon and take possession of the said lands and materials for the purposes aforesaid, and the said report, &c., and proof of payment or tender of the amount awarded, shall at all times be considered as plenary evidence of the right of any company to have, hold, use, occupy, possess and enjoy the said land or materials.' There seems to be no reason why this language, as it stands in this statute, is to be interpreted differently from what it would if it were found in a deed from a landowner to the company, and in this latter event it is not probable that a doubt would arise in the mind of anyone as to the company's right to immediately enter upon the lands thus condemned and to hold them in exclusive possession for the uses of its road." The right to maintain ejectment was sustained.

In an earlier case (*Taylor* v. *New York and Long Branch Railroad Co.,* 9 *Vroom* 28), Chief Justice Beasley, delivering the opinion of the court, designated the right of the company

obtained under condemnation proceedings contained in the company's charter as a mere easement, not, however, strictly an incorporeal right, for he declared that when the use of the land was transferred by the action of legislative will the right to use for the specified purpose everything which, in the legal sense, is comprehended in the term " land " was transferred. The controversy in that case concerned the ownership of timber cut on the premises after the award of commissioners and before the sum awarded had been paid. The case just cited was decided in the June Term, 1875, and *New York, Susquehanna and Western Railroad Co.* v. *Trimmer, supra,* was decided in November, 1890. The opinion in the latter case was delivered by the same Chief Justice. In the latter case, under statutory powers similar to those in the charter of the Morris and Essex Railroad Company, the Chief Justice demonstrated, on the most cogent reasoning, that the right acquired was not an easement, but was an estate comprehending title to lands. It is within the power of the legislature, in authorizing land to be condemned for a public use which may be permanent, to determine what estate therein shall be taken and to authorize the taking of a fee or any less estate in its discretion. Where a statute authorizes the taking of a fee it cannot be held invalid or that an easement only was acquired thereunder, on the ground that an easement only was required to accomplish the purpose the legislature had in view. That is a legislative and not a judicial question. *Sweet* v. *B., N. Y. & P. R. R. Co.,* 79 *N. Y.* 293, 299, 300; *Brooklyn Park Commissioners* v. *Armstrong,* 45 *Id.* 254.

In *Hibernia Railroad Co.* v. *De Camp, supra,* the statute under which the condemnation was conducted was an act to authorize the construction of underground railroads, and the right acquired was defined to be the mere right to tunnel and excavate the earth for the use of its tracks, with a proviso that such right of way should not include the right to permanently use or occupy the surface of the earth immediately above such railroad, and it was held by this court that all that was acquired by condemnation was a right of way and

not the fee-simple of lands, but an easement only, on the reasoning that the phraseology used in the statute could not mean ownership of lands; it must mean the right to construct, operate and maintain a railroad upon, through and under the land of another. The language of the act under which the latter condemnation was prosecuted is totally unlike the language of the charter of the Morris and Essex Railroad Company and is language consistent only with the right of way, whereas in the charter of this railroad company it is explicitly declared to be a seisin and possession in fee-simple.

But, independently of the effect of the condemnation under the company's charter, it is clear, by the rules of the common law and under an unbroken series of decisions in this state, that by the deed in question the railroad company took an estate in fee. The operative words of conveyance in the Stewart deed were of a grant to the company, its successors and assigns forever, words which, by the common law in a grant to a corporation, convey a fee-simple estate. The qualifying words in the *habendum* clause, " to have and to hold," &c., "unto the said the Morris and Essex Railroad Company and their successors and assigns forever, for all purposes mentioned in said act of incorporation and the several supplements thereto passed and to be passed," are simply a qualification of the fee that enured to the company by the operative words of the grant.

"Of fee-simple," says Lord Coke, " it is commonly holden that there be three kinds, viz., fee-simple absolute, fee-simple conditional and fee-simple qualified or a base fee. But the more genuine and apt division were to divide fee—that is, inheritance—into three parts, viz., simple or absolute, conditional and qualified or base, for this word *simple* properly excludeth both conditions and limitations that defeat or abridge the fee." 1 *Inst.* 1 *b.* "Where an estate limited to a person and his heirs has a qualification annexed to it, by which it is provided that it must be determined whenever that qualification is at an end, it is then called a qualified or base fee—as

in the case of a grant to A and his heirs, tenants of the Manor of Dale, whenever the heirs of A cease to be tenants of that manor their estate determines." 1 *Cruise Dig.* 63; 1 *Inst.* 27 *a*. "If land is given to a man and to his heirs as long as he shall pay 70s. annually to A, or as long as the Church of St. Paul's shall stand, his estate is a fee-simple determinable, in which case he has the whole estate in him; and such perpetuity of an estate, which may continue forever, though at the same time there is a contingency which, when it happens, will determine the estate (which contingency cannot properly be called a condition, but a limitation), may be termed a fee-simple determinable." *Plowd.* 557. "Though the estate will determine when the event marked as the boundary to the time of continuance shall happen, in the meantime the whole estate is in the grantee or owner, subject only to a possibility of reverter in the grantor. The grantee has an estate which may continue forever, though there is a contingency which, when it happens, will determine the estate. This contingency cannot, with propriety, be called a condition; it is part of the limitation, and the estate may be termed a fee. Plowden uses the phrase 'fee-simple determinable.'" 1 *Pres. Est.* 431, 441, 442, 484. Chancellor Kent uses the words "qualified, base or determinable fee" promiscuously, as defining an estate which may continue forever, but is liable to be determined without the aid of a conveyance by some act or event circumscribing its continuance or extent. And he adds: "Though the object on which it rests for perpetuity may be transitory or perishable, yet such estates are deemed fees, because, it is said, they have a possibility of enduring forever. It is the uncertainty of the event and the possibility that the fee may last forever that renders the estate a fee and not merely a freehold." 4 *Kent Com.* 9. "The proprietor of a qualified fee has the same rights and privileges over the estate till the qualification upon which it is limited is at an end, as if he were a tenant in fee-simple." 1 *Cruise Dig.* 65; *Plowd.* 557; 4 *Kent Com.* 11; *Seymour's Case*, 10 *Co.* 97; 1 *Pres. Est.* 404. So long as the qualified fee remained the grantor or his

heirs had no right of entering upon the lands. If the estate granted was terminated by breach of the condition, then the whole estate was gone and there could be no partial forfeiture. He who enters for breach of condition regularly shall have the land of his first estate. *Co. Litt.* 202 *a; Com. Dig.* 533, O 6; per Chief Justice Green, *McKelway* v. *Seymour,* 5 *Dutcher* 329. The precedents in our courts are strictly in conformity with this common law doctrine.

In *State* v. *Brown,* 3 *Dutcher* 13, a deed was made to the Morris Canal and Banking Company, their successors and assigns, to the only proper use, benefit and behoof of the said party of the second part, their successors and assigns, " as long as used for a canal." The charter of the canal company empowered it to acquire land without limitation in point of estate, and provided for the operation and privileges of the company for one hundred and fifty years, and then that the canal and its appurtenances should become the property of the state. The court held that the deed in question conveyed all the right, title and interest of the grantor in the land and its appurtenances, and however much the corporation might be restricted in the use of its estate it was nevertheless the owner in fee of the land as long as the estate continued, although it may have had no right to use the land for any other purposes than those expressed in the grant. In the decision of the case the court adopted, without qualification, the common law doctrine that, by the conveyance, the grantees took a qualified fee, liable to be defeated whenever they ceased to use the land for the purpose specified in the grant, but that while the estate continued and until the qualification upon which it was founded was at an end the grantee had the same rights and privileges over his estate as if it were a fee-simple. The case was reversed in *Brown* v. *Morris Canal Co., Id.* 648, but for a reason not in any manner involved in the construction or effect of the deed or the estate granted thereby.

In *Southard* v. *Central Railroad Co.,* 2 *Dutcher* 13, a deed was made to a railroad company for certain lands, to be occupied for the sole and only use of a depot for passengers and

freight and other necessary buildings for the accommodation of the company, with a proviso that if used for any other purpose than those designated, or if the grantees should use any other building within one mile of said premises for such purposes, or should use said premises for an inn and tavern, then said grantees should forfeit their estate therein. In *Cornelius* v. *Ivins, Id.* 376, land was conveyed to be used for the purposes of a rail or tramway, with a condition that if the grantee. failed to use it for the purpose specified in the deed, he should forfeit his estate therein and the land should revert to the grantor, his heirs and assigns. In both of these cases it was held that an actual estate was granted, determinable only by a forfeiture and re-entry or an ejectment.

In *New York Bay Cemetery Co.* v. *Buckmaster,* 20 *Vroom* 449, this court held that a deed in fee for a burial lot from a cemetery company, with an *habendum,* " to have and to hold the granted premises to the said," &c., " his heirs and assigns, for the uses of sepulture only and to or for no other uses whatever, subject to the conditions and limitations and with the privileges specified in the rules and regulations now made or that may hereafter be made and adopted by the managers of the cemetery company for the government of the lot-holders and visitors of the same," conveyed to the grantee the fee, and that the fact that the grantee was limited in the use which he might make of the property did not deprive him of his title or his right of possession, and that under the deed the grantee might maintain ejectment against the cemetery company.

In McKelway *v.* Seymour, the land was conveyed to the grantees in fee for a raceway and embankment for a water-power, with a proviso that so much of the premises as should not be used for the purpose specified should revert to the grantor, and it was held that the grantees took a title in fee-simple subject to forfeiture by non-user, that although it was a qualified fee, liable to be defeated by the breach of the condition, while it lasted it had all the qualities of a fee-simple absolute, and that the plaintiff had no right of entry upon

the lands so long as the qualified fee of the grantee remained. 5 *Dutcher* 321, 329, 332.

In Fitzgerald *v.* Faunce a deed was made to Faunce, his heirs and assigns, " of the sole right, privilege, use and enjoyment, at all times for all purposes, of fishing whatsoever, and for no other purposes," of two described lots, " to have and to hold to the grantee, his heirs and assigns forever." The action was in trespass and directly presented a question of title as between the parties, both of whom claimed under a common grantor. This court held that the deed conveyed to the grantee an actual estate in the strip of land and that he became thereby riparian owner, and that if the estate was so qualified as to use that neither the grantee nor his heirs could make a grant from the state available, the intervention of it between the upland and the river would make the plaintiff's grant from the riparian commissioners inoperative as against the estate and rights conveyed to F. by his deed. In the decision of the case the court said : " Conveyances to railroad, canal and water companies, and to mining companies, for a special use, as, for instance, for a depot or for the accommodation and victualing of passengers, for a rail or tramway, for a canal or raceway, and of minerals and ores, are always regarded as conveyances of estates in lands, and if the words of conveyance are adapted to convey a fee the estate granted will be a fee, though the grantee is restricted in the use of the estate conveyed," followed by a citation of cases. 17 *Vroom* 536, 596, 597.

In New Jersey Zinc and Iron Co. *v.* Morris Canal and Banking Co., the canal company had not acquired title either by grant or by condemnation. The title set up was a title by an adverse possession of upwards of forty years. Vice Chancellor Van Fleet, distinguishing title acquired by adverse possession, such as the title involved in *Pennsylvania Railroad Co.* v. *Breckenridge,* 31 *Vroom* 583, and a right such as the canal company might acquire under the peculiar terms of its charter, from title by a grant of an estate in fee, either absolute or qualified, used this language: " Under a convey-

ance, even if it be of only a qualified fee, the defendants have while their estate continues, by the plain terms of their grant, an absolute right to the exclusive possession of the land conveyed, and any attempt by their grantor to exercise any sort of possession over the land, or to use any part of it as a means of advantage or profit to himself, would be in plain derogation of his grant and a clear violation of the defendants' rights. The defendants, under a deed conveying only a qualified fee, would, while their title continued, have the same right to the exclusive use and enjoyment of the land, and as complete dominion over it for all purposes, as though they held it in fee-simple absolute, and no one, I suppose, would pretend that it would be possible for a grantor, after making a title of that description, to set up with the least show of success a right or interest of any kind in the land conveyed." 17 *Stew. Eq.* 398, 403, 409.

The defendant's counsel, to sustain the contention that the company took an easement only in the lands granted to it by the Stewart deed, relied greatly on *Green* v. *Morris and Essex Railroad Co.*, 1 *Beas.* 165. The question involved in that case was the obligation of the company to construct wagonways where its railroad should intersect any farm or lands of any individual. That obligation was imposed by the ninth section of its charter, and was wholly independent of the nature of the estate taken by the company in condemnation proceedings. The company had condemned the lands of the complainant, and, pending an appeal, the matter was submitted to arbitrators. The arbitrators made an award and a release was given under seal. A suit at law having been brought against the company for not constructing a suitable crossing, the release was pleaded and a bill was filed to reform the deed so as to make it conform to the agreement of the parties. A decree was made enjoining the company from setting up the deed as a bar to recovery in an action at law. The decree was affirmed in this court. 2 *McCart.* 469. In the Court of Chancery an opinion was expressed that the deed of release conveyed no greater right than the company acquired by the condemnation, and hence the right to have a

farm crossing subsisted, notwithstanding the deed. Under that view the relief that was granted was unnecessary, and that subject was not adverted to in the opinion in this court. If the remarks of the Chancellor are to be taken as a judicial determination that a conveyance by deed will not affect charter obligations which would subsist where premises were taken by condemnation, such a construction was contrary to the decision of the Supreme Court in *Brearly* v. *Delaware and Raritan Canal Co., Spenc.* 236, and was overruled in *Perry* v. *Pennsylvania Railroad Co.,* 26 *Vroom* 178. If the opinion rendered in the Court of Chancery is taken to have affirmed that a conveyance of lands, with all the formal terms necessary to confer a fee, created an easement only, the decision is contrary to the great weight of authority, not only at common law but in the courts of this state.

The Morris and Essex Railroad Company took possession of the land conveyed to it by Stewart and constructed its railroad thereon, with an embankment, under which it constructed an undergrade crossing, with masonry, abutments and wing-walls of the height and width specified in the company's deed. The company completed and put in operation its road in 1865, and operated the same continuously until the lease to the Delaware, Lackawanna and Western Railroad Company. The latter company from that time operated and is still operating the railroad for railroad purposes. The grant of Stewart to the company was in fee, and the contingency which when it happened would determine the estate, has not yet arisen. The title is at this time in the plaintiffs.

The defence, therefore, must rest on justification and not on title. The only plea on the record is a plea of the general issue. In an action of trespass title may be given in evidence under the general issue. *Todd* v. *Jackson,* 2 *Dutcher* 525. A justification, such as leave and license or a private right of way, must be specially pleaded. *Hetfield* v. *Central Railroad Co.,* 5 *Id.* 571; 1 *Chit. Pl.* 505. Such a defence was fully considered by counsel, and the case will be regarded now as if the proper plea had been introduced by amendment.

To justify the acts complained of the defendants rely upon the stipulation in the deed from Stewart to the railroad company, whereby the company agreed to erect and maintain the wagon-road or crossing in question. This stipulation, although inserted in a deed to the company, was the covenant of the grantee (*Finley* v. *Simpson*, 2 *Zab.* 311; *Cooper* v. *Louanstein*, 10 *Stew. Eq.* 285), and at law operated as a grant of a newly-acquired easement, or, as was said by Lord Westbury, "as if it were a counter grant by the grantee." *Godd. Easem.* 108; *Goold* v. *G. W. Deep Coal Co.*, 2 *De G., J. & S.* 600; *Gale Easem.* 46, 47; *Hagerty* v. *Lee*, 25 *Vroom* 580.

The grant in terms is to Stewart without the word "heirs" or words of perpetuity. Such a grant, by the common law, would create only a personal right for the life of Stewart. Where the right is granted in a deed in the nature of a reservation, and it is manifest from all the recitals in the deed on the subject that the plain purpose of the parties was to create a right for the benefit of the parts of the whole tract which had been severed by the conveyance, the grant will be construed as creating an easement appurtenant to the premises and will pass as such without the word "heirs," at least in equity. *Coudert* v. *Sayre*, 1 *Dick. Ch. Rep.* 386, 395. In the courts of some of our sister states the same construction has been given to such grants in courts of law (*Jones Easem.*, §§ 89, 106), and in *National Bank* v. *Segur*, 10 *Vroom* 173, it was held that a covenant that confers an immediate, permanent and beneficial effect on the use to which real estate is designed to be applied will run with the title without words of perpetuity and will support an action at law by one who afterwards succeeds to the title. But in *Hagerty* v. *Lee*, *supra*, the question whether the word "heirs" is necessary at law to create an easement which should be appurtenant to the land was expressly left undecided. Counsel, on the argument, assumed that this grant was attached to the land and passed with the estate as an appurtenant. That view will be adopted for present purposes.

As appurtenant to the two parcels retained by Stewart the easement passed to the grantee under the deed from Stewart to Creveling and by intermediate conveyances became vested in Meagher, who succeeded to the title of Stewart to so much of the entire tract as remained in him after the conveyance to the railroad company. Meagher, by his deed of September 4th, 1895, conveyed to Breckenridge two parcels of land, part of the original tract, consisting of two lots, each fifty by two hundred and fifty feet in dimensions, one lot being on the north side and the other on the south side of and both adjoining the lands conveyed to the railroad company, and extending on each side entirely across the opening of the passageway referred to in the company's deed. By the last-mentioned conveyance the right in this easement became vested in Breckenridge, and under such right the defendants justify the acts complained of.

The construction of the grant of the right of way in the deed from Stewart to the company presents the merits of this controversy, and the solution of the contested problem depends upon the terms of the grant, construed in conformity with the rules which control in the construction of grants. One granting an easement may limit the grant and the grantee takes subject to the restrictions imposed. The limitation may be with reference to the purposes for which the easement may be used, as, for instance, a right of way may be granted for agricultural purposes only, or for mining purposes, or with reference to its use as a footway or a carriageway or a way for cattle. *Jones Easem.*, § 355 ; *Gale Easem.* 199. In this instance the subject of the grant is defined as " a suitable wagon-road or crossing," and the purpose for which the same is to be made is defined to be " so as to enable said Stewart to travel and cross freely between his lands on each side of said granted premises."

Cases such as *Central Railroad Co.* v. *Valentine,* 5 *Dutcher* 561, and *Dand* v. *Kingscote,* 6 *Mees. & W.* 174, have no relevancy to this controversy. In the former case, Valentine, by a deed, conveyed to the railroad company the land upon

which was an embankment that formed part of his mill-dam
and a bridge through which the water passed from the pond,
with a reservation to the grantor, his heirs and assigns for-
ever, of the right and privilege to enter upon the conveyed
premises from time to time to make, amend and repair his
mill-dams and to remove therefrom the manure that might
accumulate from time to time. The company used the em-
bankment and bridge for the railroad track. In an action by
the company for entering to repair the dam, this court held
that the grantor had the right to enter upon the premises and
do whatever was necessary to maintain the dam, provided it
did not conflict with the use thereof by the grantees, and that
these rights would exist if the deed had contained no such
reservation. The case was put upon the principle that where
a grantee takes lands conveyed and a grantor holds lands re-
tained, each had a right to whatever was necessary to the
enjoyment of the respective premises for the purposes for
which they were then or were intended to be used, whether
such intended use was mentioned in the deed or not. In the
other case the plaintiff was the owner of two adjoining closes
of coal lands, the one in the township of Amble and the other
in the township of Hauxley. The deed, dated in 1630, by
which the grantor conveyed land in the manor of Amble,
contained the words "excepting and reserving out of the
grant all mines of coal within the fields and territory of A.
aforesaid, together with sufficient wayleave and stayleave to
and from said mines, with liberty of sinking and digging pit
or pits." By another deed of the same day, the same parties
conveyed to other persons lands in the manor of Hauxley,
with the like exception and reservation. The defendant
erected on the Hauxley close a steam engine and engine-house,
with a pond to supply water for the engine, and also a rail-
way for carrying the coal from that pit. This railway passed
over the close Hauxley and then across the close Amble.
The action was in trespass, and the justification was under the
reservation in the deeds. The case finds that the steam
engine which was erected was necessary for working the

lower seams of coal, and that the pond for the supply of water was necessary for the use of the engine, and therefore, as was said by Chief Justice Green, in Central Railroad Co. *v.* Valentine, they were necessary incidents to the thing granted and passed with it upon the intention of the parties as deduced from the language of the grant when applied to the subject-matter. With respect to the construction of the railway there was evidence that wayleave, the term used in the reservation, was known as the privilege of crossing lands for the supply of coals to the purchaser, and that sending coals by the grantee of sea-sale collieries by means of a railway was universally the mode of transit. The case finds that without a railway for shipment the lower seams could not be worked without loss; that a large sum of money had been expended, and that for that expenditure there could be no adequate return unless by the profits from the export trade. Baron Parke, delivering the opinion of the court, said : " There is no doubt that the object of the reservation is to get the coals beneficially to the owner of them, and therefore it should seem that there passes by it a right to such description of wayleave and in such a direction as will be reasonably sufficient to enable the coal-owner to get from time to time all the seams of coal to a reasonable profit; and therefore the owner is not confined to such description of way as is in use at the time of the grant and in such a direction as is then convenient. * * * Nor upon the supposition that a railway for shipping was necessary can we say there was any excess in the mode of construction, for the case finds that the railroad had been judiciously designed and constructed." The acts done by the defendants for which the present suit was brought were in no sense necessary to enable the grantee to travel and cross between his lands on each side of the granted premises, and neither of the cases above cited applies to this controversy. It will also be observed that in Dand *v.* Kingscote the court held that the coal-owner could not carry over Amble the coals that were got in Hauxley, although they were parts of the same mineral field and both deeds contained the same reservation.

In *Newcomen* v. *Coulson*, 5 *Ch. Div.* 133, by an award
under an enclosure act, it was directed that certain allottees,
and the owners for the time being of their allotments, should
have a wayright and liberty of passage for themselves, their
respective tenants and farmers, as well on foot as on horse-
back, and with their carts and carriages, and to lead and
drive their horses, oxen and other cattle from the highway
over the end of the allotments to their respective allotments,
&c.   The owner of one of the allotments commenced build-
ing houses upon it, and began to lay down a metaled road
where there had only been an ordinary cart-track.   On an
application for an injunction the court held that this use of
the property was justified.   The decision was rested upon the
terms of the grant.   Jessel, Master of the Rolls (at *p.* 142),
made this language the foundation of his decision: " It was
said that the grant conferred a right to use the way only so
long as the allotment was used for agricultural purposes.   I
cannot find any such restriction.   The right is to the owners
or owner for the time being of the land.   Now, land, accord-
ing to English law, includes everything on or under the soil ;
all buildings that you may erect on it, all mines that you may
sink under it.   *   *   *   I have no doubt that the word
' land ' was used advisedly.   This being so, it appears to me
the right is a general right of way—a right of way to all the
houses which may be built on the land in question."   And
with respect to the metaled road he said : " It was conceded
to be a principle of law that the grantee of a right of way has
a right to enter upon the land of the grantor over which the
way extends for the purpose of making the grant effective—
that is, to enable him to exercise the right granted to him.
That includes not only keeping the road in repair, but the
right of making a road.   *   *   *   It cannot be contended
that the word ' repair ' in such a case is limited to making
good the defects in the original soil by subsidence or washing
away ; it must include the right of making the road such that
it can be used for the purpose for which it is granted.   There-
fore, I think the defendants have a right to make an effective

carriageway, going, as they are going, by the shortest route, and not interfering with the land to a greater extent in width than the width of the street pointed out by the deed itself."

In the later case of *United Land Co.* v. *G. E. Railway Co.*, 10 *Ch. App.* 586, the railway company was empowered to make a railway, and for that purpose to take lands, among which were crown lands. By the act it was enacted "that the said company shall and they are hereby required, at their own costs and charges, to make and construct such convenient communications across, over and under said railway * * * as shall, in the judgment of the commissioners of woods and forests," &c., "be necessary for the convenient enjoyment and occupation of the lands of Her Majesty, and such communications, when so made, shall at all times be kept in good order and repair by and at the expense of the company." The crossings fixed by the commissioners were level crossings and they were constructed by the railway company. At the time this act was passed the lands on both sides of the railway lands were marsh lands. These lands came into the possession of the land company, and the latter company laid them out into building lots, and a considerable number of houses were built thereon and others were in the course of building. The roads, with the level crossings, formed the only means of communication for the occupants of the houses with the rest of the country. The court held that, the right being unrestricted in terms, the crossings were to be communications for all purposes to which, at the time or at any future time, the owner should think fit to appropriate his land. The ground of decision in the Court of Appeals is stated by Lord Justice Mellish in these words : " But when a right of way is created by grant or by act of parliament, then it must depend on the proper construction of the grant or act of parliament whether the right of way is to be used for all purposes or for only limited purposes. No doubt there are authorities that, from the description of the lands to which the right of way is annexed and of the purposes for which it is granted, the court may infer that the way was intended to

be limited to those purposes.   But if there is no limit in the
grant the way may be used for all purposes."   In the case as
reported in *L. R.*, 17 *Eq. Cas.* 158, Vice Chancellor Malins
(at *p.* 167) says : " It has been argued very strenuously that
when a right of way is granted for one purpose it cannot be
used for another.   I quite agree.   The law is perfectly set-
tled that if one man has a right of way over the land of
another to go to a particular place he cannot use it for the
purposes of going to that place and a place beyond it, because
the servient tenement is only subject to a certain use and a
certain inconvenience.   He has agreed that it shall be used
for a particular purpose, and having so agreed, he is not
bound to submit to its being used for any other purpose."

Neither do the cases last above cited apply to this litiga-
tion, but the passage quoted from the opinion of Vice Chan-
cellor Malins in principle is quite in point.   The easement in
this case, in plain terms, is a grant of a right of way between
the two parcels of land into which the tract was divided by
the grant to the railroad company.   It is impossible to give
it any other construction consistent with the words used.
Where a way is created by a grant for the benefit of particu-
lar land, its use is limited to such land, and cannot be ex-
tended to other land.   *Jones Easem.*, § 360 ;  *Acroyd* v. *Smith*,
10  *C. B.* 164.   If one grants a right of way from D. to
Blackacre, and the grantee afterwards purchases lands adjoin-
ing to Blackacre, he cannot justify the user of the way to
those lands.   2 *Com. Dig.* (*Chimin*, *D 5*) 299.   One having
a right of way to his land, Blackacre, over land of another,
has no right to drive his cattle to Blackacre, and then to other
land beyond it.   In the leading case upon this point (*Howell*
v. *King*, 1 *Mod.* 190) it was urged for the owner of the right
of way that when his cattle were at Blackacre he could drive
them whither he would.   On the other side it was said that
if this were so he might purchase one hundred or one thou-
sand acres adjoining Blackacre, to which he had a prescrip-
tive right of way, and so the owner of the soil would lose
the benefit of his land ; that a prescription presupposed a

grant and ought to be continued according to the intent of the original creation. To this the court agreed, and gave judgment for the owner of the land. *Jones Easem.*, § 360. A right of way appurtenant to a dominant tenement can be used only for the purpose of passing to or from that tenement. It cannot be used, even by the dominant owner, for any purpose unconnected with the enjoyment of the dominant tenement, neither can it be assigned by him to a stranger, and so be made a right in gross, nor can he license a stranger to use the way when he is not coming to or from the dominant tenement. *Godd. Easem.* 321, 329; *Washb. Easem.* 254, 256. The cases to this effect are numerous. Many of them are cited by Mr. Jones in the foot-note to the section above cited.

The laying of these pipes in the roadway in no sense conferred a benefit on the lands to which the way was appurtenant, nor were the pipes adapted to facilitate or promote access between the two parcels of land to which the easement was appurtenant. They extend underground the entire distance of the way, and are designed to be used as part of a pipe line for the purpose of conveying oil.

The contention that the pipes laid underground do no injury to the railroad company as the owner of the fee, and therefore the company has no ground of complaint, is without any support either in principle or authority. On such a theory the defendants would be authorized to lay pipes under or through the premises for the transmission of gas or water —in fact, to construct an aqueduct of the dimensions of the span of this passageway to carry the waters of the Delaware to supply the cities of the seaboard. Where the words of the grant are clear and unequivocal there is no room for the application of the principle that the grant must be construed most strongly against the grantor; the parties must be confined to the plainly-expressed agreement in the deed. Whether the right claimed will impose a greater or less burden on the company's land than the right granted is an irrelevant inquiry. *Johnson* v. *Jaqui*, 10 *C. E. Gr.* 410, 413; *S. C.*, 12 *Id.* 526.

The defendants having no title or justification under the right of way, the judge properly directed a verdict for the plaintiffs. The judgment should be affirmed.

*For affirmance*—THE CHANCELLOR, COLLINS, DEPUE, DIXON, GARRISON, LIPPINCOTT, LUDLOW, VAN SYCKEL, ADAMS, BOGERT, HENDRICKSON, NIXON, VREDENBURGH. 13.

*For reversal*—None.