ABRAM SPEER

*v.*

THE ERIE RAILROAD COMPANY.

[Filed March 26th, 1903.]

S. conveyed to a railroad company a strip of land running through his farm. In the deed the company stipulated as follows: "The said party of the second part doth for itself and its successors agree to make and maintain the necessary fences on both sides of said tract of land, which shall be built before the work of grading on said track is commenced, and shall provide the party of the first part with a suitable and convenient road crossing across the track of said railway where the party of the first part may direct." A crossing at grade was provided in the manner stipulated. The successor of the company subsequently raised the tracks and constructed an embankment fifteen and one-half feet high without bridging the crossing and thus wholly destroyed it.—*Held,* (1) that the

above-quoted stipulation enured to the benefit of the heirs of the grantor; (2) that the way having been once located could only be changed by mutual consent and that the company must construct and maintain the crossing at the original level; (3) that complainant has not been guilty of laches in applying for relief (*New York City* v. *Pine, 185 U. S. 93,* distinguished) ; (4) the right of crossing given or reserved by the deed is an unlimited right enuring to the benefit of any grantee of the whole or any part of the land retained.

*Mr. Halsey M. Barrett,* for the complainant.

*Mr. Chauncey G. Parker, Mr. Cortlandt Parker, Jr.,* and *Mr. Cortlandt Parker,* for the defendant.

STEVENS, V. C.

The bill is filed to compel the defendant company to restore a farm crossing over its tracks in Upper Montclair. By deed dated June 20th, 1870, John A. Speer conveyed in fee to the predecessor of the defendant company, for the consideration of $487.50, a strip of land one hundred feet in width running through the middle of his farm. The farm contained about forty acres. In this deed the grantee company stipulated as follows:

"The said party of the second part doth for itself and its successors agree to make and maintain the necessary fences on both sides of said tract of land, which shall be built before the work of grading on said track is commenced, and shall provide the party of the first part with a suitable and convenient road crossing across the track of said railway where the party of the first part may direct."

In conformity with this stipulation the grantee directed that the crossing should be where an old road ran through the middle of the farm. To this direction the company assented and provided a crossing accordingly. Its single track ran through the farm, nearly at grade, the rails being laid about eighteen inches above the natural surface. On both sides of the track planking was laid and the crossing so constructed that the grantor could cross with his farm wagons, horses and cattle. The way was used by the grantor, and, after his death, by the complainant, his sole heir-at-law, up to the month of April, 1900. During the latter part of this period, however, the complainant seems to

have utilized it only as a driveway for cows, so much of the farm as lay west of the track having been devoted to pasturage.

In the year 1897 the company constructed an additional track, and in April, 1900, raised both tracks so as to run over the valley road at an elevation of thirteen feet (clear head room), pursuant to a decree of this court regulating the use of that highway as between the North Jersey Street Railway Company and the defendant company. In thus raising them the latter company was obliged to raise them at the farm crossing, and it constructed across complainant's land a solid earthen embankment about fifteen and a half feet high. It did not bridge the crossing, but completely destroyed it. Complainant can only now go from the easterly to the westerly part of his farm by making a considerable circuit on land not his own.

Just before, or very shortly after, the work of grading had begun the complainant notified the agents of the company of his right. The notice of claim is dated March 23d, 1900. The company's first reply is dated March 29th, 1900. Mr. Moore, the company's engineer, says the work of elevating began about the 1st of April of that year. The company, notwithstanding the notice, went on and constructed the embankment across the way.

The stipulation in the deed is only that the company and its successors shall provide the *party of the first part* with a suitable and convenient road crossing. It does not, in terms, extend to his heirs and assigns, but it has been settled that these terms are not, in a case like the present, necessary to attach the covenant perpetually to the land. In *Pipe Line Co.* v. *Delaware, Lackawanna and Western Railroad Co., 33 Vr. 254, 274,* the stipulation was that the company should erect and forever maintain under the rails of its railroad a suitable wagon road or crossing, &c. Mr. Justice Depue, speaking for the court of errors, said: "The grant, in terms, is to Stewart, without the word 'heirs' or words of perpetuity. Such a grant at common law would create only a personal right for the life of Stewart. Where the right is granted in a deed, in the nature of a reservation, and it is manifest from all the recitals in the deed on the subject that the plain purpose of the parties was to create a right for the benefit of the part of the whole tract which had been severed by the conveyance,

the grant will be construed as creating an easement appurtenant to the premises, and will pass as such without the word 'heirs,' at least in equity." The covenant in the case in hand does not differ essentially from that which was the subject of consideration in the *Pipe Line Case,* so far as it is in the nature of a reservation. Here, as there, the plain purpose was to create, or rather to preserve and perpetuate, a right for the benefit of the severed parts of the whole tract. It therefore follows that the complainant, who is the sole heir of the grantor of the land, is entitled to the benefit of it.

In view of the decision in the *Pipe Line Case,* the company does not seriously contest its liability in some form. It says that it is willing to give a crossing in one of three ways—(1) it will undertake to give an outlet to the valley road over a right of way *to be* acquired by it; this will compel the defendant to make a circuit, off his own land, in order to go from his house and barn and from the valley road to his land west of the raised tracks; (2) it will provide approaches on its own land, parallel to its tracks, which will carry the crossing over the road at grade; or (3) it will construct approaches on the complainant's land so as to carry the crossing over the road at right angles to the direction of the tracks. The company suggests, further, that in case the court shall be of opinion that the complainant is not obliged to accept either of these three modes of crossing, then it shall itself ascertain the damages which the complainant will suffer from the severance and compel him to accept them, in lieu of the specific relief which he asks.

The complainant refuses to accept any of these propositions, and insists upon his right to a crossing at the level at which it existed for the thirty years prior to the raising of the tracks. In reply to this insistment, the company says that such a crossing would cost over $5,000, while any of the other modes of crossing would not cost more than $500 or $600.

It would seem, at first blush, as if a crossing such as the company offers would answer complainant's requirements, and that the rule should be applied that if subsequent events have made literal performance by defendant so onerous that it would impose great hardship upon the company, and be productive of little or

no benefit to complainant, then it will not be decreed. *Trustees of Columbia College* v. *Thacher, 87 N. Y. 311.* But a little consideration will show, I think, that this case does not fall within the reason of the rule. In the first place, if the company will now be obliged to spend $5,000 upon what I shall call a tunnel crossing, it is only because, in the face of not only constructive, but *actual,* notice of complainant's rights, it chose to go on and disregard them. The company's engineers do not tell us what such a crossing would have cost had it been made while the work was progressing. It is obvious that it would have cost very much less than it will now. The company was under no compulsion to construct the embankment as it has constructed it. If the company deliberately disregarded complainant's right, it should not be permitted to stand in any more favorable position for having done so. In the second place, the evidence shows very clearly that the right, as it has heretofore been enjoyed, is gradually becoming more valuable. There is evidence on both sides that the land in the vicinity is coming into the market for residence purposes, and that it now possesses a value much above its value as farm land. An outlet to the valley road, such as the tunnel crossing would afford, would give added value to the complainant's land west of the embankment.

If, then, the complainant has a legal right to a tunnel crossing, there is nothing in the present situation, created by the defendant itself, after full notice, that would warrant the application of the above rule. I will first consider the nature and extent of the right, and then whether equity should deprive him of it in the form in which it was given.

The covenant is that the predecessor of the defendant company will "provide the party of the first part with a suitable and convenient road crossing across the track of said railway." This right is not, as it was in the *Pipe Line Case (supra)*, limited "so as to enable said S. to travel and cross freely between his land on each side of said granted premises." It is an unlimited right —a right of passage for all purposes—and the case in hand, as it seems to me, comes within the principle of the cases, cited with approval in the *Pipe Line Case,* which hold that a crossing has been given for all the purposes to which, at the time, or at

any future time, the owner or any grantee of the whole or any part of his land may think fit to appropriate it. One of the passages quoted with approval in the *Pipe Line Case* is taken from a judgment of Lord-Justice Mellish in *United Land Co. v. Great Eastern Railroad Co., L. R. 10 Ch. App. 587,* and is as follows: "When a right of way is created by grant or act of parliament it must depend on the proper construction of the grant or act of parliament whether the right of way is to be used for all purposes or for only limited purposes. No doubt there are authorities that, from the description of the land to which the right of way is annexed and of the purposes for which it is granted, the court may infer that the way was intended to be limited to those purposes. But if there is no limit in the grant, the way may be used for all purposes." See, also, *Newcomen v. Coulson, 5 Ch. Div. 133.* A glance at the map makes it apparent that on a subdivision of the land into lots the tunnel crossing would be far preferable as a means of reaching either on foot or by vehicles what is the principal highway in that locality, viz., the valley road. Speer had, by the above-quoted reservation, the right to go from the westerly part of his farm to that road, and the above cases show that his grantees, however numerous, would have the same right.

This brings me to the question whether complainant has the right to the tunnel crossing which he now claims.

The deed provided that the crossing was to be "where the party of the first part may direct." It is admitted that the direction was both given and complied with. That irrevocably fixed the place of crossing. The case is identical with that suggested by Chief-Justice Beasley in *Morris and Essex Railroad Co. v. Central Railroad Co., 2 Vr. 209.* He says: "If A grant to B a right of way over his farm, such way to be laid out by B, it could not be plausibly pretended that after such way had once been located and ascertained by B it could afterwards be relocated or altered or added to by him." The precise location having been once for all settled, it is as binding upon the parties as if it had been fixed by an actual description in the deed itself. But it is obvious that if its location could not be changed laterally it could not be changed vertically. The vertical change

here proposed would be much more inconvenient than any lateral change. The way, if changed vertically, would not be the way located and agreed upon by the parties. It has been suggested, however, that while a crossing with raised approaches would not be as convenient as the old crossing, a tunnel crossing would be more convenient, because the tracks not being crossed at grade, the element of danger would be eliminated; and that if complainant ought not to be compelled to accept an inferior crossing, he is not entitled to a better. But certainly this ought not to be urged as an argument why the company should not perform its contract. The crossing would only be better in the sense that it would be less dangerous. In all other respects it would be the same. It would hardly be permitted to defendant to say: "I ought not to be compelled to give you the very way which I have stipulated to give you, because I will now be obliged to so construct it as to obviate all danger of collision."

It being clear that complainant has the legal right to the very crossing which his father designated and the company gave, the question then is whether equity ought to compel him to take something else. I do not see any reason for compelling him to take a roundabout crossing off his own land, nor do I see any reason for compelling him to accept, as a substitute, a more dangerous and inconvenient one over the tracks of the company, whether that crossing be constructed on the company's land, with approaches parallel to the tracks, a very awkward way of getting over them, or a crossing with approaches constructed on complainant's land—land which he never gave for the purpose—at right angles to these tracks; it being remembered that the only ground on which this is asked is that of expense; and the expense having been, to a considerable extent at least, incurred only as a result of the violation of complainant's right after notice.

It is urged, however, that if complainant cannot be compelled to take a less advantageous mode of crossing, he should at least be compelled to take damages in lieu of performance. If complainant could condemn, there would be much force in the contention; for it has been repeatedly decided, both here and in the court of errors, with reference to analogous cases, that this court has power to award damages. But it is conceded by counsel

on both sides that this right of way cannot be condemned. And the reason is obvious. The charter of the original company preserved the old road to the landowner (*P. L. of 1867 c. 160 § 9*), and the General Railroad act, under which the present company is formed, requires that suitable wagon-ways shall be constructed over, under or across the railroad where it intersects any farm. *Gen. Stat. p. 2661 § 84.* The company could not condemn that which, in every condemnation proceeding, is expressly reserved or given to the owner.

If, then, the law gives the right to the crossing, and if the crossing has been actually located, constructed and maintained under an agreement or covenant which neither party may vary from without the consent of the other, it would seem plain that the court should enforce the agreement as it finds it, and not give something as a substitute, unless the company can show that, under the particular circumstances of the case, to enforce the legal right would be inequitable.

It is very clear that the mere expense will not, under the circumstances, give rise to an equity.

Long and undisturbed possession may create an equity, but here the possession was with the complainant, and not with the company.

Laches might, if present, give rise to an equity, but here there was diligence. It is indeed contended that complainant should have acted while the proceedings between the railroad and trolley companies were in progress. But how could he have acted? Even if it were shown that complainant had other than constructive notice of these proceedings, he could hardly have anticipated that the company, without necessity, would obstruct his way with an embankment when they might have easily bridged.

There is only one other conceivable ground on which it can be claimed that complainant is estopped from claiming the very right which the law, and the contract, both, gave him, and that is the ground suggested by the case of *New York City* v. *Pine,* *185 U. S. 93.* In that case it appears that the Bryam river flowed partly in the State of New York and partly in the State of Connecticut. It had two branches, the east branch being in Connecticut and the west branch being chiefly in New York.

The city of New York was constructing a dam near the Connecticut line with the intention of appropriating the waters of the west branch to increase its water-supply. The bill was filed by a riparian owner in Connecticut, lower down the stream, to enjoin the city from making this appropriation. The circuit court of appeals affirmed the decree of the circuit court granting an injunction, but the supreme court reversed, and held that the complainant should have damages, and not an injunction, unless the damages were not paid.

It is, of course, apparent that the city of New York could not condemn land in Connecticut. The grounds upon which the supreme court refused to sanction the injunction, in the first instance, were these: That it was not a case between two individuals, one of whom asserted that his property rights were being infringed by the other; that it was rather a case between an individual having a right that was of small value to him, and a public corporation which was undertaking to supply its citizens with a necessary of life; that the city had been engaged in this work of public utility, to the knowledge of complainant, for two years prior to the commencement of his suit; that during all that time the plaintiffs and the city had been trying to agree upon the amount of compensation, thus showing, as Mr. Justice Brewer says, "that the plaintiffs were seeking *compensation* for the injuries they would sustain, and were not insisting upon their alleged right to an abandonment of the work," and that had the injunction been continued a costly public work would have been rendered useless. In view of these facts Mr. Justice Brewer says: "If one aware of the situation believes he has certain legal rights and desires to insist upon them, he should do so promptly. If by his declarations or conduct he leads the other party to believe that he does not propose to rest upon such rights, but is willing to waive them for a just compensation, and the other party proceeds to great expense in the expectation that payment of a fair compensation will be accepted and the right waived, especially if it is in respect to a matter which will largely affect the public convenience and welfare, a court of equity may properly refuse to enforce those rights, and, in the absence of an agreement for compensation, compel him to sub-

39

·mit the determination of the amount thereof to an impartial tribunal." *Simmons* v. *Paterson, 15 Dick. Ch. Rep. 393,* is, in our own state, decided upon the same principle.

The case in hand differs from the case cited in the very particulars which justified the court in giving compensation rather than an injunction. In the first place, no public interest is involved. It is perfectly immaterial to the public whether the defendant's trains be carried over a bridge or arch twelve or thirteen feet wide or over an embankment. The plaintiff does not ask that the company be ejected from the lands or restrained from running its trains. In the second place, the lapse of time intervening is considerably less. The parties were in negotiation for a few months and not for two years; and the negotiations related not only to a money equivalent, but also to the alternative rights of way proposed and proposed only by the company. In the third place, the parties appear from the start to have been hopelessly at variance because of the opposite views taken of the nature and value of complainant's right, and Mr. Moshizker, the company's agent in the matter, admits that Mr. Speer did not go so far as to agree to accept a money equivalent. It is not a fair inference from the evidence that complainant waived his right to an injunction. From the outset he insisted upon it. The situation was this: the company, in the face of notice, obstructed the crossing, and having obstructed it, began to propose substitutes for it. Unless it was improper for the complainant to have merely listened to these proposals he was not lacking in diligence. It would seem plain that he has done nothing which the company is in a position to insist upon as being a waiver of the right which the deed and long continued enjoyment under the deed give him.